# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JILL M. LUNDSTEN,**

        Plaintiff,

      **-vs-**                          **Case No. 13-C-108**

**CREATIVE COMMUNITY LIVING SERVICES, Inc.**
**LONG TERM DISABILITY PLAN,**
**CREATIVE COMMUNITY LIVING SERVICES, Inc.,**
**and AETNA LIFE INSURANCE COMPANY,**

        Defendants.

---

## DECISION AND ORDER

---

This matter comes before the Court on Jill M. Lundsten's motion to alter or amend the Court's judgment dismissing her action to recover long-term disability benefits under the Creative Community Living Services, Inc. ("CCLS") Long Term Disability Plan ("the Plan"). Fed. R. Civ. P. 59(e). On cross-motions for summary judgment, the Court held that Lundsten's claim was untimely pursuant to the contractual limitations period set forth in the Plan. 2015 WL 1143114 (E.D. Wis. March 13, 2015).

The Court now agrees, contrary to its prior ruling, that Lundsten's claim is not time-barred. This error – and the waste of time and resources that it engendered – was avoidable, and not only because the defendants' timeliness argument is wrong. More perplexing is Lundsten's failure to

counter that argument, as she now has, with the point that state law provides the applicable limitations period, not the Plan language.

It is well-worn territory that Rule 59(e) should not be used to present arguments that could have been presented before the initial entry of judgment. *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). This is not to say that district courts *cannot* consider newly-raised post-judgment arguments. As one court observed, Rule 59(e) "accords no right to make untimely post-judgment arguments," but it does not impose "a limit on a trial court's discretion to consider such arguments." *In re UAL Corp.*, 360 B.R. 780, 784 (Bankr. N.D. Ill. 2007). The Court prefers to make the correct decision, not hide its head in the sand in the name of procedural formality. To that end, and for the reasons that follow, Lundsten's motion to alter or amend the Court's judgment is granted.

Since Lundsten's action is not time-barred, the Court re-visited the substantive arguments in the parties' cross-motions for summary judgment. The Court now finds that Lundsten is entitled to summary judgment on her claim that the Plan's denial of benefits was arbitrary and capricious. Lundsten is also entitled to an award of attorney's fees and costs under ERISA's fee-shifting statute. Defendants, as previously held,

are entitled to summary judgment on Lundsten's claim that CCLS failed to provide Plan documents in a timely manner. Defendants are also entitled to summary judgment on their claim to recover social security disability benefits under the Plan's offset provision. Contrary to the Court's prior ruling, however, the defendants are not entitled to an award of fees and costs.

In accordance with the foregoing and the analysis that follows, this matter is remanded to the Plan administrator for further proceedings consistent with this opinion.

## I.    Motion to alter or amend

In ruling that Lundsten's claim was time-barred, the Court relied upon the contractual limitations period set forth in the Plan documents. In so doing, the Court was not aware – because neither party highlighted this fact in their summary judgment papers – that the Plan is insured, not self-funded. *See* Amended Complaint, ¶ 5 ("Creative contracted with Aetna [Life Insurance Company] to pay LTD benefits under the Plan through a policy of insurance Aetna issued to Creative"). More to the point, Lundsten did not argue, in opposition to the defendants' timeliness argument, that insured (as opposed to self-funded) plans are subject to state insurance regulations that apply in the instant case.

- 3 -

As relevant here, Wisconsin law provides that an "action on disability insurance coverage must be commenced within 3 years from the time written proof of loss is required to be furnished," Wis. Stat. § 631.83(1)(b), and moreover, that no insurance policy may "Limit the time for beginning an action on the policy to a time less than that authorized by the statutes." § 631.83(3)(a). These statutory provisions are not preempted by ERISA because they regulate insurance within the meaning of ERISA's savings clause. 29 U.S.C. § 1144(b)(2)(A).

To determine whether a state law regulates insurance, courts first ask whether it does so from a "common-sense view of the matter." *Unum Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 367 (1999). Then, courts consider three factors to determine whether the regulation fits within the "business of insurance" as that phrase is used in the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq.: first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry. *Ward*, 526 U.S. at 367. These factors are "guideposts, not separate essential elements … that must each be satisfied to save the State's law." *Id.* at 374.

- 4 -

From a common-sense standpoint, the imposition of a minimum limitations period for disability insurance claims involves the regulation of disability insurance. This conclusion is bolstered by the three guideposts. First, a limitations period that cannot be contractually lowered has the effect of transferring more risk to insurance companies. Second, the statute is an integral part of the policy relationship because it "dictates the terms of the relationship between the insurer and the insured, ..." *Id.* at 374-75. Finally, the rule is limited to the insurance industry; indeed it is "aimed at it." *Id.* at 375.

A law saved from preemption may still be preempted if it falls within ERISA's "deemer clause." § 1144(b)(2)(B). State laws that purport to regulate insurance by "deeming" a plan to be an insurance are outside the saving clause and remain subject to preemption, *Ward* at 367 n.2., but insured plans, such as the CCLS Plan, are "subject to indirect state insurance regulation. An insurance company that insures a plan remains an insurer for purposes of state laws 'purporting to regulate insurance' after application of the deemer clause." *FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990); *see also Moran v. Rush Prudential HMO, Inc.*, 230 F.3d 959, 970 (7th Cir. 2000) ("The Supreme Court's interpretation of the deemer clause 'makes clear that if a plan is insured, a State may regulate it

- 5 -

indirectly through regulation of its insurer and its insurer's insurance contracts'" (quoting *FMC Corp.*, 498 U.S. at 64). Accordingly, Wisconsin's regulation of insured disability plans is not preempted under the deemer clause.

The Court held that Lundsten's claim is untimely because the Plan's three-year limitations period began running in December of 2009 and expired in December of 2012 (Lundsten filed suit over a month later). 2015 WL 1143114, at *1. The Court reasoned as follows:

> Lundsten argues that her claim for benefits under the 'any reasonable occupation' standard should be treated as separate from her claim under the 'own occupation' standard. This is incorrect because the deadline for filing claims is defined in relation to the elimination period, and the elimination period references a single 'period of disability.' Accordingly, Lundsten was asked to provide additional documentation to support the continuation of benefits that were initially granted under the own occupation standard. The any occupation standard references the same period of disability that is referenced in the elimination period. *Put another way, there is no new elimination period when the standard shifts from own occupation to any occupation.*

*Id.* (internal citations omitted) (emphasis added).

Lundsten argues now, as she did before, that the limitation periods for "own occupation" and "any occupation" claims should be separate. Put another way, and in the language of the statute, she argues that the limitations period should run from "the time written proof of loss is

- 6 -

required to be furnished," § 631.83(1)(b), Wis. Stats., on her claim for benefits under the "any reasonable occupation" standard.[1] The Court agrees. Unlike the Plan, § 631.83(1)(b) does not tie its 3-year limitations period to a single elimination period/period of disability. By referencing "proof of loss," the limitations period on a claim for "any occupation" disability benefits begins to run when the Plan requires proof of loss on a claim for those benefits.

Therefore, Lundsten's claim is timely, and the Court must address the substantive arguments presented in the parties' cross-motions for summary judgment.

## II. Motions for summary judgment

Summary judgment is appropriate if the record evidence reveals no genuinely disputed material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party. *Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2012). On cross-motions for summary judgment, the Court is required to adopt a "Janus-like perspective, viewing the facts for purposes of each motion through the lens most favorable to the

---

[1] At summary judgment, Lundsten argued that the limitations period for her claim under the "any reasonable occupation" standard ran from October of 2010, at the earliest. Plaintiff's Proposed Findings of Fact, ¶ 15. Now, Lundsten argues that it ran from March 19, 2012. Amended Complaint, ¶ 25. Her suit is timely in either event.

non-moving party." *Moore v. Watson*, 738 F. Supp. 2d 817, 827 (N.D. Ill. 2010). Thus, the Court "construes all inferences in favor of the party against whom the motion under consideration is made." *Kort v. Diversified Coll. Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005).

## A.    Background

Lundsten was employed by CCLS as a benefits coordinator in the human resources department. Lundsten was born in 1963, has a high school education, and began her employment with CCLS on April 16, 1996, working full time until June 23, 2009. Lundsten's job duties included the following: providing clerical support to the vice president of human resources; communicating employee status changes to company sponsored benefit plan providers; ensuring accuracy in registers and account balances of participants in Section 125 for health and dental plans; securing completion of all forms to compile year-end plan data for purposes of tax completion; informing staff on a monthly basis his/her eligibility for dental coverage, enrollment, changes, and waiver forms; auditing monthly benefit plan billings and preparing payment; and verifying total hours worked of employees per pay period to ensure status coincides.

In August of 2009, Lundsten applied for disability benefits under the CCLS Long Term Disability Plan. Lundsten indicated that her disability

was fibromyalgia, degenerative disc disease, and arthritis. Lundsten's application was granted under the Plan's "own occupation" disability standard. *See* Plaintiff's Proposed Findings of Fact ("PPFF"), ¶ 4 ("From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day" if you are "not able to perform the material duties of your own occupation solely because of: disease or injury" and your "work earnings are 80% or less of your adjusted pre-disability earnings").

On October 6, 2010, Aetna notified Lundsten that her 24-month "own occupation" disability period would end September 20, 2011, and that in order to be entitled to LTD benefits after this period she must be considered disabled from performing any reasonable occupation. Aetna requested updated medical records evidencing Lundsten's inability to perform "any reasonable occupation." The Plan defines a reasonable occupation as "any gainful activity for which you are, or may reasonably become fitted by: education; training; or experience; and which results in; or can be expected to result in; any income of more than 60% of your adjusted pre-disability earnings." PPFF, ¶ 4.

Lundsten provided Aetna with office notes from Dr. Jeffrey Gorelick, her treating physician, dating from November 5, 2009 through July 21,

- 9 -

2011. In these notes and several "Attending Physician Statements," Dr. Gorelick opined that Lundsten continued to meet the clinical medical criteria for Fibromyalgia Syndrome (FMS), that her chronic pain and fatigue were widespread, affecting her entire body, and that her pain and fatigue resulted from FMS. Dr. Gorelick also observed that Lundsten's symptoms continued to worsen over time, with pain levels varying from 2 to 8 and 9, sometimes reaching 10 out of 10. Dr. Gorelick continued to advise Lundsten to "remain out of full time work and pursue sedentary work in a very limited capacity," i.e., "up to 10 hours per week."

Aetna subsequently directed Lundsten to undergo an independent medical examination with Dr. Robert Zoeller. Dr. Zoeller interviewed Lundsten for approximately 30 minutes and examined her for approximately 20 minutes. Dr. Zoeller diagnosed Lundsten with (1) chronic neck, upper back pain with intermittent paresthesis following previous C5-C7 fusion; (2) chronic low back pain with intermittent radicular symptoms, no evidence of neurologic impairment; (3) history of diffuse muscle pain, fatigue, possible fibromyalgia; (4) opiate dependence; (5) electrodiagnostic evidence of carpal tunnel syndrome; (6) generalized anxiety disorder and major depression; and (7) symptom magnification syndrome. Regarding the last diagnosis, Dr. Zoeller wrote:

- 10 -

Symptom magnification was evidenced by extensive healthcare utilization, subjective complaints that are out of proportion to objective findings, disability more than indicated given physical findings. And some nonphysiologic findings on examination including pain with even superficial palpation. The diagnosis of symptom magnification syndrome is not intended to discredit the subjective complaint of pain, its possible basis and organic pathology, or the existence of a certain degree of objective disability. This individual reports symptoms that are essentially non-negotiable, to control the environment, and result in significant implication of perceived and expressed functional limitations. *This should not be interpreted to suggest an intentional misrepresentation of pain disability but more likely represents a learned pattern of illness behavior.* (Emphasis added).

Dr. Zoeller concluded that Lundsten could perform light work:

Work capacity/functional impairments: Based on an extensive review of the patient's records, a review of diagnostic studies that are available in the medical record, a review of electrodiagnostic findings, and the patient's physical examination, *it is my opinion that this individual can safely perform light work activities.* This would include lifting weights at 11 to 20 pounds occasionally, 1 to 10 pounds frequently and negligible weights constantly. I would also suggest limiting overhead activities to occasional given patient's underlying cervical spondylosis, in particular. I would suggest allowing position changes every 60 minutes to accommodate myalgias. I would not define any other specific limitations with regard to her condition. In particular, I do not feel limiting hours is appropriate. I do believe it would be more harmful to limit activity and hours which could only lead to further deconditioning and increased pain in an individual who already appears to be profoundly deconditioned. These opinions are expressed to a reasonable degree of medical certainty … (Emphasis added).

On September 12, 2011, Aetna invited Dr. Gorelick to respond to Dr.

- 11 -

Zoeller's findings and asked Dr. Gorelick to provide a "medical explanation" and "supporting objective medical evidence" if he disagreed with Dr. Zoeller. Dr. Gorelick wrote:

> Dr. Zoeller does not ask for her typical pain, does not inquire how severe anxiety/depression was in spite of a long history of treatment, nor fatigue. He does not comment at all on impact of fatigue, emotional issues and memory problems have on her day to day function. …
>
> During the physical examination, [Dr. Zoeller] did not comment on whether there was any joint tenderness. … He defined the intensity of pain only in the forearms (and not in any other areas, for reasons not clear). … He does not really define in his physical exam which trigger points were responsible for arm symptoms, as he does not make a distinction between tender points and trigger points. … It was his opinion diffuse muscle pain and fatigue was possibly fibromyalgia, which he thought … was a diagnosis of exclusion. He saw no records of rheumatologic studies to exclude other potential etiologies for diffuse pain. I began seeing her in 2006 and he did not request earlier records, which would have noted this had been done. … He does, however, talk about symptom magnification syndrome which he thought was evidenced by extensive healthcare utilization and subjective complaints out of proportion to objective findings, disability more than indicated given physical conditions and some non physiological findings on exam, including pain with even superficial palpation. *It is not clear to me how he knows this is not an extreme case of fibromyalgia. … He notes she appears to be profoundly deconditioned, but I do not know how he comes to this conclusion based on her physical examination … This is all in conflict with my opinions. … I wholeheartedly disagree with Dr. Zoeller on many of his opinions, including her ability to work.* (Emphasis added).

- 12 -

On December 15, 2011, Aetna informed Lundsten that her disability benefits were being terminated:

> Since the effective date of your LTD benefits was September 21, 2009, the any reasonable occupation test of disability above is effective September 21, 2011. We had certified your LTD benefits from September 21, 2009 through present based on your primary medical conditions of chronic pain, fibromyalgia, arthritis, shoulder and back pain, carpal tunnel syndrome, TMJ, degenerative disc disease along with your co-morbid conditions of anxiety and depression.
>
> We completed our comprehensive clinical review based on your primary medical conditions which included all records including office visit notes and diagnostic test reports from Dr. Jeffrey Gorelick, Dr. Steven Rhodes, Dr. Teresa Grimes, Dr. Mohamed Yafai from the date of disability of June 23, 2009 through present. We also reviewed the Attending Physician Statement completed by Dr. Gorelick dated November 23, 2010 which stated no ability to work due to spinal degenerative disc disease, fibromyalgia, cervical and lumbar degenerative disc disease and history of post cervical fusion from the year 2008. …
>
> We arranged for an Independent Medical Evaluation with a physical with occupational medicine specialty which was completed on August 2, 2011. The IME physician was provided with a complete history of your medical records for his review and he also took a complete history from you directly during this visit on 08/02/11. The IME … stated that you could safely perform light work activities which include lifting weights of 11 to 20 lbs. occasionally, 1 to 10 lbs frequently with negligible weights constantly. The IME also stated you should limit overhead activities to occasional given your underlying cervical spondylosis in particular and suggested allowing position changes every 60 minutes to accommodate myalgias. *The IME did not find any other specific limitations and that you could work 8 hrs. a day at full time capacity.*

- 13 -

The IME report was sent to Dr. Gorelick on September 12, 2011 for review and asked if he agree[d] or not with the independent testing completed and provided the entire report. If Dr. Gorelick disagreed with the IME report he was advised to provide medical explanation and supporting objective medical evidence. Dr. Gorelick's response was received on November 16, 2011 … . *However, Dr. Gorelick did not offer any objective clinical evidence that would refute the clinical findings of the independent medical examiner*.

Based on an own occupation comparison, … we reviewed your occupation and determined that it is a sedentary physical demand level which is less than the given like demand level and meets the restrictions of no overhead work and allows to change positions. You were receiving $18.10/hour at the time … your disability began. Your reasonable wage of 60% of your adjusted pre-disability earnings is $10.99/hour. Your own occupation pays wages or salary at reasonable wages or greater.

In view of this information, we are determining that you are not prevented by reason of disease or injury from performing a reasonable occupation … (Emphases added).

Lundsten appealed Aetna's decision and was asked to provide updated medical records from her various treating doctors, including Dr. Gorelick. After seeing Lundsten on January 19, 2012, Dr. Gorelick reported that her pain was worse than her prior visit, and observed that she had "widespread muscular tenderness with 18/18 FMS site specific tender points," with the right side being more involved than the left. Dr. Gorelick also noted that Lundsten's pain ranged from 4 to 10, and that "due to pain

- 14 -

she has considerable functional limitations." Finally, Dr. Gorelick stated, "I respectfully disagree with Dr. Robert Zoeller's opinions regarding disability and previously sent a report to Aetna expressing this opinion. … I suggested she remain off work indefinitely utilizing a handicap parking sticker and follow through with Social Security Disability process."

On February 4, 2012, Dr. Gorelick completed an "Attending Physician Statement," stating that Lundsten continued to experience widespread chronic pain and had shown no improvement. Dr. Gorelick opined that Lundsten's fibromyalgia resulted in her being permanently disabled from working and that her condition was unlikely to improve.

On March 14, 2012 the Social Security Administration ("SSA") determined that Lundsten was totally disabled – that she was unable to engage in any substantial gainful activity, dating from June 14, 2009. Lundsten informed Aetna of the award and told Aetna that she would provide it. However, Lundsten did not forward a copy of the SSA determination to Aetna, and Aetna never obtained a copy. Aetna possessed several signed authorizations enabling Aetna to obtain all of Lundsten's award information, but never attempted to use those authorizations. Aetna also never told Lundsten that she had a right to have the information considered by Aetna.

On May 4, 2012, Aetna sent Lundsten's medical records to Elena Mendelsohn, a psychologist, and Dr. Stuart Rubin, a physical medicine specialist, for "peer review." Ms. Mendelsohn limited her observations to Lundsten's mental/psychological status, and deferred to "appropriate medical specialists to determine the impact of claimant's medical status on her functionality." Dr. Rubin observed that Lundsten "was recently awarded retroactive Social Security Disability by the Social Security Administration after hearing, but we have not received the notice of award, the order or decision." Dr. Rubin further stated that he had reviewed the medical records provided, including the August 2, 2011 IME. Dr. Rubin concluded:

> Functional impairment is not supported at this time from 6/23/11 through 5/31/12. Although the claimant has chronic pain, fibromyalgia, chronic widespread pain, it is unclear why the claimant is unable to work at all during the time period in question. In addition, multiple providers indicated the claimant could work 8 hours per day as indicated in the restrictions and limitations form of 8/2/11. It was also indicated that the claimant can continuously sit, stand, and frequently walk, and allow position changes hourly as of 8/2/11. Notes subsequent to 8/2/11, although indicating the claimant does have widespread fibromyalgic symptoms and has status post-cervical fusion and has chronic widespread pain, did not indicate why the claimant is unable to work. … On 8/2/11, it is clear this date the claimant can work 8 hours a day. … In the Attending Physician Statement of 2/4/12, the form indicates no change from prior. … *Based on the above, it is the opinion of this reviewer that the claimant can work at the*

*sedentary level while not torqueing the neck*. The claimant should change positions as needed every half hour at most. (Emphasis added).

By letter dated June 15, 2012, Aetna notified Lundsten that it was

upholding the denial of benefits:

> Your first date of absence from work was 6/23/09. Following the LTD policy's benefit elimination period, your LTD benefits were approved through 6/22/11. LTD benefits were terminated, effective 6/23/11, as there was a lack of documentation to support your inability to work at any reasonable occupation as of 6/23/11. Your diagnoses have included the following: degenerative disc disease, cervical and lumbar; cervical sprain/strain; low back pain; neck pain; rotator cuff, sprain/strain; tendonitis; shoulder strain/bursitis, bilateral; osteoarthritis, right knee; tendonitis, right biceps; foot pain, bilateral; headaches; fibromyalgia; Major Depression Disorder; anxiety disorder; cognitive impairment; hyperlipidemia; hypertension; obesity. There was documentation in your file pertaining to treatment received by you throughout the duration of your absence from work and all of this documentation was reviewed during the appeal. However, as benefits were terminated as of 6/23/11 and thereafter, comment here will include the most recent information in the file. …

> You recently advised Aetna that you were approved for Social Security Disability (SSD) benefits. However, our disability determination and the SSD determination are made independently [and are] not always the same. The difference between our determination and the SSD determination may be driven by the SSA regulations. We have reviewed your claim for LTD benefits consistent with the LTD policy requirements and provisions cited above. As part of that review, we updated clinical information from your treating providers. *Additionally, we may have information that is different from what SSA considered, or we may not have been*

- 17 -

*provided with a basis for the SSD determination, and the evidence that was relied on for the SSD determination has not been identified to us.* Therefore, even though you may be receiving SSD benefits, we are unable to give it significant weight in our determination, and we find that you are not eligible for continuing LTD benefits based on the LTD policy definition of Total Disability or Totally Disabled cited above. ...

Based upon our review, *the original decision to terminate LTD benefits, effective 6/23/11, has been upheld as there was a lack of documentation* (such as documentation of clinically significant abnormal finding upon physical examination and/or diagnostic testing; documentation of pain symptoms of the severity and/or intensity to preclude your ability to work at any reasonable occupation; documentation of significant side effects from medication; abnormal findings upon formal mental status examination and/or performance based tests of psychological functioning with standardized scores, or behavior observations with the frequency, duration, and intensity of symptoms observed, etc.) *to support your inability to work at any reasonable occupation as of 6/23/11 and thereafter.* This decision is final and not subject to further review. (Emphasis added).

## B.     Analysis

The Court previously held, in a separate round of summary judgment briefing, that Lundsten's claim for benefits is subject to deferential, arbitrary and capricious review, not *de novo* review. 2014 WL 2240716 (E.D. Wis. May 30, 2014). The question now becomes whether Lundsten is entitled to summary judgment on her claim that the defendants' denial of benefits was arbitrary and capricious. Conversely, if

- 18 -

the denial of benefits was not arbitrary and capricious, then the defendants are entitled to summary judgment.

Under the arbitrary and capricious standard of review, the Court may overturn a benefit administrator's decision only if the decision is "downright unreasonable." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009). This standard is deferential, but it is not a rubber stamp. *Id.* In this respect, the Seventh Circuit has clarified that the phrase downright unreasonable "should not be understood as requiring a plaintiff to show that only a person who had lost complete touch with reality would have denied benefits. Rather, the phrase is merely a shorthand expression for a vast body of law applying the arbitrary-and-capricious standard in ways that include focus on procedural regularity, substantive merit, and faithful execution of fiduciary duties." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 n.5 (7th Cir. 2010). Accordingly, the Court will not uphold a denial of benefits if the administrator fails to provide specific reasons for rejecting evidence and denying the claim. For ERISA purposes, the arbitrary and capricious standard is "synonymous with abuse of discretion." *Raybourne v. Cigna Life Ins. Co. of N.Y.*, 576 F.3d 444, 449 (7th Cir. 2009) (*Raybourne I*).

Moreover, it is undisputed that Aetna operates under an inherent

- 19 -

conflict of interest because it has discretionary authority to decide disability claims and is also the payor of such claims. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) ("The plan grants MetLife (as administrator) discretionary authority to determine whether an employee's claim for benefits is valid; it simultaneously provides that MetLife (as insurer) will itself pay valid benefit claims"). This conflict is "weighed as a factor in determining whether there is an abuse of discretion." *Holmstrom*, 615 F.3d at 767 (quoting *Glenn*, 554 U.S. at 115).

### 1.    SSD award

Lundsten's primary argument is that Aetna unjustifiably failed to consider her social security disability award. The Plan requires disability applicants to apply for Social Security Disability ("SSD") benefits, for which the definition of disability is more stringent than the Plan's "any reasonable occupation" standard. *See, e.g., Holmstrom* at 763 n.4 (comparing Act's "inability to engage in any substantial gainful activity" definition with Plan's "any occupation" disability definition). If awarded, SSD benefits are used as an offset against disability benefits under the Plan. Under these circumstances, the Plan's failure to consider an award of disability benefits "suggests arbitrary decision making." *Holmstrom* at 773; *see also Raybourne v. Cigna Life Ins. Co. of N.Y.*, 700 F.3d 1076, 1087 (7th

- 20 -

Cir. 2012) ("*Raybourne II*"); *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998).

In its denial letter, Aetna stated, in pertinent part, that the difference between its determination and the SSD determination "*may* be driven by the SSA regulations," and further, that Aetna "*may* have information that is different from what SSA considered," or Aetna "*may not have been* provided with a basis for the SSD determination, and the evidence that was relied on for the SSD determination has not been identified …" This is unsatisfactory. Aetna was required to confront this evidence directly, not evade and prevaricate. Put another way, the issue is whether Aetna "has a plausible explanation for the difference in the final determinations of disability, an explanation that would lead a reviewing court to conclude that the difference is not based on the structural conflict of interest that is present here." *Raybourne II*, 700 F.3d at 1087. Aetna did not offer a plausible explanation for reaching a conclusion contrary to SSA. *See also Holmstrom* at 773 (denial of benefits was arbitrary and capricious where the administrator "essentially dissolved any relevance of Social Security determinations in ERISA cases").

Defendants argue that Aetna cannot be faulted because Lundsten repeatedly told Aetna that she would provide a copy of the award, but

- 21 -

never did. The Court credited this argument previously, but it did so in the course of analyzing whether Aetna substantially complied with ERISA's time limits for deciding administrative appeals. 2014 WL 2440716, at *3 (E.D. Wis. May 30, 2014) ("In cases in which the substantial compliance doctrine applies, a plan administrator, notwithstanding his or her error, is given the benefit of deferential review of the administrator's determination about a claim under the arbitrary and capricious standard (assuming, of course, that the plan document vests the administrator with discretion), rather than more stringent de novo review") (quoting *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 362 (7th Cir. 2011)). In that order, the Court wrote:

> Lundsten argues that it was unreasonable for Aetna to delay its decision pending receipt of Lundsten's award of Social Security Disability Benefits. This is a strange argument because Lundsten repeatedly told Aetna that she would provide a copy of the award (ultimately, she never did). It is true, as Lundsten notes, that plan administrators are required to address this brand of evidence and 'provide a reasonable explanation for discounting it …' *This is an entirely different issue from the one at hand, that being whether the defendants substantially complied with the time limits for deciding an appeal from the denial or termination of disability benefits.* Lundsten argues that Aetna should have obtained the information on its own without waiting for Lundsten to provide it. *Again, this is beside the point.* It is also nonsensical in light of Lundsten's unequivocal statements that she would submit a copy of the award.

- 22 -

2014 WL 2440716, at *6 (emphasis added) (internal citation omitted).

Lundsten's promise and failure to provide her determination was relevant to the Court's substantial compliance analysis, but it is not relevant to the Court's analysis herein. Aetna could not rely upon Lundsten's promise to provide this information because Aetna was *required* to offer a plausible explanation for why Lundsten was not entitled to "any occupation" benefits in light of the SSD award. For whatever reason, Aetna failed to do so, even though it was aware of the determination and possessed Lundsten's written authorization to obtain her information from SSA. PPFF, ¶ 29. The foregoing demonstrates arbitrary decision making and an abuse of discretion.

Aetna argues that its actions were justified under *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375 (7th Cir. 1994). In *Donato*, the court refused to consider evidence contained in the plaintiff's Social Security disability file because "although MetLife [the Plan Administrator] was apprised of [the contrary] determination, the Social Security file was never before MetLife in making Ms. Donato's benefits determination, and MetLife was bound only to consider what evidence and information was before it." *Id.* at 380. Thus, Aetna argues that Lundsten had a duty to forward the SSD determination, and her failure to do so absolves Aetna of its failure to

- 23 -

provide a reasonable explanation for discounting the award. Aetna's argument confuses the issue because *Donato* did not discuss or confront the situation where a plan administrator does not offer a proper explanation for denying benefits when SSD benefits have been awarded.[2] Post-*Donato* case law makes clear that Plan Administrators *must* consider the award decision, especially when, as here, the claimant is required to apply for SSD benefits as a means to lower the Plan's liability and the SSA standard is stricter than the Plan's disability standard. Put more explicitly, the Plan has an implied duty to actively seek the award determination when the claimant, for whatever reason, fails to provide it. Aetna failed in this regard.

## 2.    Lack of objective evidence

Lundsten also argues that Aetna's denial was arbitrary and capricious because Aetna faulted Lundsten for not providing "objective evidence" in support of her allegations of disabling pain, thereby placing improper weight on "the difference between subjective and objective evidence of pain." *Hawkins v. First Union Corp. Long Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003). "Pain often and in the case of

---

[2] The *Donato* plaintiff "forwarded MetLife a copy of the Social Security Administration's decision to grant her disability benefits." 19 F.3d at 377.

fibromyalgia cannot be detected by laboratory tests. The disease itself can be diagnosed more or less subjectively by the 18-point test …, but the amount of pain and fatigue that a particular case of it produces cannot be. It is 'subjective' …" *Id.*; *see also Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996) ("fibromyalgia, also known as fibrositis" is a "common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective"); *Leger v. Tribune Co. Long Term Disability Plan*, 557 F.3d 823, 834 (7th Cir. 2009) ("Dr. Chmell dismissed Ms. Leger's complaints of pain and attendant limitations on movement because there was 'no objective medical evidence of a disorder' that would suggest the severity of pain Ms. Leger was experiencing. … However, as noted in *Hawkins*, even if the source of pain cannot be located, it nonetheless can be real").

Aetna counters that disability plans can require objective evidence of functional limitations. *See, e.g., Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007) ("A distinction exists however, between the amount of fatigue or pain an individual experiences, which as *Hawkins* notes is entirely subjective, and how much an individual's degree of pain or

- 25 -

fatigue limits his functional limitations, which can be objectively measured"). To that end, Aetna invited Lundsten's treating physician, Dr. Gorelick, to provide a "medical explanation" and "supporting objective medical evidence" if he disagreed with Dr. Zoeller's conclusion that Lundsten could perform light work. However, Aetna never indicated what form of "supporting objective medical evidence" was necessary or sufficient to validate her claim. "When an administrator asks for additional information in broad terms, it is too easy to find later a reason to deem what it was given to be insufficient. If the administrator believes that a procedure must have certain characteristics, or that it must be performed by a certain kind of professional, it must provide at least some level of guidance, unless the test sought is so well-known that a claimant or her attorney or other representative can reasonably be expected to know what the administrator expects." *Holmstrom* at 774; *see also Halpin v. W.W. Granger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992) ("describing additional information needed and explaining its relevance, as required by [ERISA regulations], enables a participant both to appreciate the fatal inadequacy of his claim as it stands and to gain a meaningful review by knowing with what to supplement the record").

Compounding this error, Aetna credited the conclusion of Dr.

Zoeller, from whom Aetna did not require the type of "objective evidence" it faulted Dr. Gorelick for failing to provide. Selective consideration of the evidence is "another hallmark of an arbitrary and capricious decision." *Holmstrom* at 777 (collecting cases).

### 3.    Own vs. any occupation

Aetna initially granted Lundsten's application for benefits under the "own occupation" standard. Two years later, when the time came to review Lundsten's claim under the "any occupation standard," Aetna doubled-back and found that Lundsten *could* perform her own occupation. Disability plans are not estopped from altering a prior disability determination, but in "determining whether an insurer has properly terminated benefits that it initially undertook to pay out,[3] it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." *Leger*, 557 F.3d at 833 (quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 590 (8th Cir. 2002)). The previous payment of benefits "does not decide the case" but it is "part of the overall set of facts" for courts to consider. *Holmstrom* at 767.

Aetna argues that the two positions are not inconsistent because the

---

[3] The Court recognizes that Aetna did not undertake to pay out "any occupation" disability benefits, but the reasoning in this line of cases still applies because Aetna contradicted its earlier conclusion that Lundsten could not perform her own occupation.

- 27 -

initial primary diagnosis was degenerative disc disease, but 24 months later, the primary diagnosis was fibromyalgia. This distinction makes little sense, especially since both diagnoses were present initially and then later upon reconsideration under the any occupation standard. Ultimately, there is nothing in the record to suggest that Lundsten's condition improved after the initial grant of benefits. Thus, there was no evidentiary basis for the change in benefit determination. *See McOsker*, 279 F.3d at 589 ("unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those benefits"); *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2009) ("there is no explanation for the decision to cancel benefits that had been paid for some five years based upon the initial determination of total disability in the absence of any medical evidence that the plaintiff's condition had improved during that time").

*** 

For all of the foregoing reasons, the denial of benefits in this case was arbitrary and capricious.

## III. Remaining issues

In its first summary judgment ruling, the Court held that the

- 28 -

defendants were entitled to summary judgment on Lundsten's claim that CCLS did not provide Plan documents in a timely manner. The Court also held that the defendants were entitled to summary judgment on their counterclaim for SSD benefits.[4] Lundsten's motion to alter or amend does not address either holding, both of which are undisturbed by the Court's grant of relief under Rule 59(e).

The Court also held that the defendants were entitled to fees and costs under ERISA's fee shifting statute because Lundsten's position regarding the statute of limitations was not substantially justified. This opinion eviscerates that holding. The award must be vacated and the competing fee requests will be reconsidered anew.

ERISA's fee-shifting statute provides that in "any action under this subchapter … by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Courts may award fees and costs to either party so long as the fee claimant has achieved "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010). A claimant "does not satisfy that requirement by achieving

---

[4] This claim covers the period of time that Lundsten was receiving "own occupation" benefits.

- 29 -

'trivial success on the merits' or a 'purely procedural victor[y],' but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" *Id.* at 255.

*Hardt* "left open the question of whether a remand alone, without a further recovery of benefits, would constitute 'some success on the merits.'" *Young v. Verizon's Bell Atl. Cash Balance Plan*, 748 F. Supp. 2d 903, 909-12 (N.D. Ill. 2010). However, it seems clear that even in the absence of a monetary judgment, a "determination that a plan administrator abused its discretion in interpreting a plan constitutes 'some degree of success.'" *Id.* at 910-11; *see also Rappa v. Sun Life Assur. Co. of Canada*, 2014 WL 4415242, at *1-2 (W.D. Wis. Sept. 8, 2014). The Court agrees with these cases and finds that Lundsten qualifies for an award under *Hardt*.

As for the defendants, they achieved some successes in this litigation, but Lundsten never opposed their counterclaim for SSD benefits, and she simply abandoned her claim for non-disclosure of plan documents. These were procedural victories on tangential issues. However, the defendants also succeeded in persuading the Court to review the denial of benefits under the arbitrary and capricious standard of review. This result

was significant, at least for now, because it precluded the Court from entering judgment on Lundsten's claim for benefits (i.e., it limited the relief available to remand for further consideration by the Plan). Thus, the Court also finds that the defendants achieved some degree of success under the *Hardt* standard.

Having found that both parties are eligible for a fee award, the Court must exercise its discretion pursuant to two interlocking tests: the "substantial justification" test, and the five-factor test. Under the former, an award of fees to a successful party may be denied if the losing party's position was both "substantially justified" – meaning "something more than nonfrivolous, but something less than meritorious" – and taken in good faith, or if special circumstances make an award unjust. *Herman v. Cent. States, S.E. & S.W. Areas Pension Fund*, 423 F.3d 684, 696 (7th Cir. 2005). Under the second test, courts look to the following factors: (1) the degree of the offending parties' culpability; (2) the degree of the ability of the offending parties to satisfy personally an award of attorney's fees; (3) whether or not an award of attorney's fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions. *Quinn v. Blue Cross &*

- 31 -

*Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998). The five-factor test is meant to "structure or implement, rather than to contradict" the substantially justified test. *Lowe v. McGraw-Hill Companies, Inc.*, 361 F.3d 335, 339 (7th Cir. 2004). Both tests ask essentially the same question: "was the losing party's position substantially justified and taken in good faith, or was the party simply out to harass the opponent?" *Stark v. PPM Am., Inc.*, 354 F.3d 666, 673 (7th Cir. 2004).

The defendants' litigation position in opposition to Lundsten's second motion for summary judgment – the one requesting remand under the arbitrary and capricious standard – was not substantially justified. In particular, the defendants' argument that the Plan was free to disregard Lundsten's disability determination is clearly foreclosed by precedent in the Seventh Circuit. Moreover, the defendants' timeliness argument was (or should have been) a non-starter because of the distinction between insured and self-funded plans. Therefore, Lundsten is entitled to an award under § 1132(g)(1).

On the other hand, Lundsten argued in her first summary judgment motion that she was entitled to *de novo* review because Aetna decided her appeal in an untimely manner under applicable ERISA regulations. Aetna argued that it substantially complied with those regulations, thus saving

- 32 -

its entitlement to deferential review, but Lundsten countered that a 2000 regulatory amendment "called into question the continuing validity of the substantial compliance test, …" 2014 WL 2440716, at *4 (quoting *Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311 (10th Cir. 2009)). Moreover, one court bluntly held that the "'substantial compliance doctrine is not applicable under the revised regulations.'" *Id.* (quoting *Reeves v. UNUM Life Ins. Co. of Am.*, 376 F. Supp. 2d 1285 (W.D. Okla. 2005)). These were interesting and compelling arguments that have not been confronted by a court with controlling authority in this jurisdiction. Therefore, the Court finds that Lundsten's litigation position was substantially justified, and the defendants are not entitled to an award under § 1132(g)(1).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.     Lundsten's motion to alter or amend the judgment [ECF No. 91] is **GRANTED**;

2.     Lundsten's motion for summary judgment [ECF No. 73] is **GRANTED**;

3.     Defendants' motion for summary judgment [ECF No. 78] is **GRANTED-IN-PART** and **DENIED-IN-PART**;

4.     Lundsten is entitled to reasonable fees and costs. The parties

- 33 -

are encouraged to meet and seek a resolution of the amount of fees to be paid consistent with this Order; and

5.     The Clerk of Court is directed to enter an amended judgment consistent with the foregoing opinion.

Dated at Milwaukee, Wisconsin, this 20th day of August, 2015.

BY THE COURT:

_____
HON. RUDOLPH T. RANDA
U.S. District Judge